GREENCASTLE PRODUCTION CREDIT ASSOCIATION *v.* THE RIDDELL NATIONAL BANK, BRAZIL, INDIANA

[No. 20,179. Filed October 20, 1965.]

*Lyon & Boyd,* of Greencastle, and *Bowen, Myers, Northam & Givan,* of Indianapolis, for appellant.

*Robert W. Neal,* and *Miller & Miller,* of Brazil, for appellee.

PRIME, P. J.—Appellant brought this action in the court below against the appellee to recover funds,

which the appellant was unable to collect because appellee had stopped payment on certain bank money orders issued by the appellee to one Schopmeyer.

The complaint alleged that Schopmeyer made certain representations to appellee in exchange for said bank money orders, which money orders were received in due course by the appellant and subsequently were returned by the appellee marked "Payment Stopped," and that the appellant was unable to recover the funds on said money orders.

The appellee, by answer, alleged that the money orders were procured by fraud and that the plaintiff-appellant did not become a holder in due course for a valuable consideration. The cause was submitted to the court without a jury and the court rendered judgment against the plaintiff-appellant that no recovery be had. Plaintiff filed a motion for new trial on the following grounds:

"1. The decision of the Court is not sustained by sufficient evidence and is contrary to law.

"2. That the decision of the Court is not sustained by sufficient evidence.

"3. That the decision of the Court is contrary to law.

"4. Error of law occurring at the trial in this, wo-wit (to-wit): That the Court, over plaintiff's objections, permitted defendant's witness, John Riddell, to testify concerning a transaction concerning which plaintiff had no privity and which was extreneous (extraneous) to the issues of said cause, as the same did not in any wise effect the legality of the instruments sued on."

The court overruled appellant's motion for new trial and this appeal followed in due course.

The assignment of error was that the court erred in overruling appellant's motion for new trial.

Appellant waived specification 4 in the motion and herein urges specifications 2 and 3, that the decision of the court is not sustained by sufficient evidence and is contrary to law.

As admitted by appellant, under a negative judgment, where the appellants do not receive the affirmative relief to which they allege they are entitled, an assignment that the decision of the court is not sustained by sufficient evidence raises no question. However, the evidence will be reviewed herein so that the question of whether or not the verdict was contrary to law can be properly determined.

The salient facts in this matter are as follows:

In January, 1958, one Vernice Schopmeyer was indebted to the appellant, Greencastle Production Credit Association, of Greencastle, Indiana, in the sum of $8,328.17, which was secured by a chattel mortgage. Payments were in default and appellant was pressing for payment. Schopmeyer went to the appellee-bank, The Riddell National Bank, Brazil, Indiana, and based upon certain representations, obtained a loan in the amount of $1200.00. This occurred on January 16, 1958. A few days later, on January 25, 1958, Schopmeyer executed another loan in the sum of $3,000.00. The bank issued a money order in the first instance for $1200.00 payable to Vernice Schopmeyer. In the second instance, the bank issued the money order to Greencastle Production Credit Association, the appellant herein. These were bank money orders issued against the bank's account in the Federal Reserve Bank at Chicago, Illinois. Schopmeyer took the two bank money orders to one Ralph R. McQueen, a lawyer of Brazil, Indiana, who was the local representative of the credit association in Clay County, Indiana. McQueen had been, for many years, an attorney and

agent of the appellant. One Russell Pierce, general manager of appellant, was present. McQueen took the two money orders from Schopmeyer together with $300.00 in cash and delivered the two money orders and cash to Mr. Pierce, the general manager, who took the same to appellant's office in Greencastle, Indiana, and put the two bank money orders in their safe. The evidence shows that McQueen evidently was suspicious and questioned Schopmeyer as to how he obtained the money orders. Schopmeyer stated that he had obtained a personal loan at the appellee-bank. Testimony further shows that McQueen told Schopmeyer that they would hold the money orders until the following Wednesday when they would expect the balance of the loan to be paid off.

During the following week, McQueen went to the appellee-bank to talk to Mr. Riddell, the president. It developed that Schopmeyer had executed a chattel mortgage to the appellee-bank covering the same property that was already mortgaged to appellant. At this point, Mr. Riddell stopped payment on the bank's money orders. After the bank stopped payment on the two money orders, the appellant continued to hold them in their safe and did not present them for payment. The facts show that the $300.00 cash was credited to Schopmeyer's debt to the appellant, but that no other credit was made to his account. The facts further show that a short time later, on February 14, 1958, the appellant sued Schopmeyer on the entire amount of his indebtedness to them, and asked for foreclosure on the chattel property. The appellant took judgment on April 29, 1958, in the amount of $8,293.37. The foreclosure and execution sale was held on this judgment on July 9, 1958, and the court remitted to the appellant $4,400.97.

On July 18, 1958, Schopmeyer filed bankruptcy proceedings in the United State District Court at Terre

Haute, Indiana, and on July 22, 1958, he was declared a bankrupt. At the bankruptcy proceedings, the appellant, Greencastle Production Credit Association, filed its claim in the amount of $3,642.57 and eventually received a dividend in the sum of $1,213.30.

This instant action with which we are concerned was then filed on July 12, 1960.

The appellant here seeks to recover on the theory of being a "holder in due course." Acts 1913, Ch. 63, § 52, p. 120, being, § 19-402, Burns' 1950 Repl., defines a holder in due course as follows:

"A 'holder in due course' is a holder who has taken the instrument under the following conditions:

"1. That the instrument is complete and regular upon its face;

"2. That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;

"3. That he took it in good faith and for value;

"4. That, at the time it was negotiated to him, he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

The appellant here insists that it had no notice or knowledge of any fraudulent transactions. We cannot agree with this position here because the appellant's own agent, McQueen, indicated suspicion and grave doubts and went to the appellee-bank to investigate the matter. A party about to receive a bill or note, if there are any suspicious circumstances, should make inquiry. *State Bank, etc.* v. *Lawrence* (1912), 177 Ind. 515, 519, 96 N. E. 947; *Bright Nat. Bank* v. *Hartman* (1916), 61 Ind. App. 440, 449, 109 N. E. 846; *Woodsmall* v. *Myers* (1928), 87 Ind. App. 69, 158 N. E. 646. In the State Bank case at page 519 the court said:

"The law is well settled in this State that persons dealing in commercial paper are required to use reasonable diligence where the paper is offered for sale under circumstances that are calculated to excite the suspicion of a reasonable cautious person. . . ."

It is further held in *Woodsmall* v. *Myers, supra,* at pp. 71 and 72, that:

"It is the law that a purchaser in good faith of a negotiable instrument, complete and regular on its face, before it is due, is not required to make any inquiry of the transaction out of which the note grew. But going to the question of his good faith, the jury has the right to consider, along with other circumstances, the fact that such inquiry, with reasonable opportunity, was not made. . . ."

There can be no doubt here that the suspicion was aroused because appellant's own agent, McQueen, determined that a fraudulent negotiation was being perpetrated and had ascertained knowledge of the entire circumstances.

We must conclude that the appellant herein did not take in good faith and for value. Appellant contends that mere suspicion is not enough to overthrow the presumption that the checks were accepted in good faith. Under ordinary circumstances it could be said that mere suspicion or slight doubt would not be enough to overcome the doctrine of good faith but this cause was surrounded with extraordinary circumstances. The appellant was very suspicious as shown by the testimony of agent McQueen.

"Q. And at the time of this meeting did you apprise Mr. Riddell of the character and nature of the remitter of these two drafts?

"A. Well, prior to that, let me state.

"Q. Yes.

"A. When Mr. and Mrs. Schopmeyer came in the

office they had two cashiers checks and $300. I had been instructed by the Board of the Production Credit Association to proceed with foreclosure of the chattel mortgage that the Association held against Mr. and Mrs. Schopmeyer. Before filing that I had written Mr. Schopmeyer informing him that I had been employed and instructed to proceed to foreclose the mortgage and gave him until a certain definite time which expired on this Saturday, to pay the mortgage off in full. At the time that he and his wife came in the office, when they had these two cashiers checks plus $300, as I remember it, it lacked some three or four thousand dollars paying the unpaid balance due under the mortgage. I asked Mr. Schopmeyer if he would—when he would have the rest of it and he said on Monday. I said, 'Now, Vernice, I want you to understand that we must have all of this money.' And he said, 'I'll have the rest of it on Monday.'

"I—because of some former experience in dealing with Mr. and Mrs. Schopmeyer, I went into more or less in detail about how he secured these checks. I said, 'Vernice, did you give Mr. Riddell a mortgage on this property for these checks?' And he said, 'No, sir.' Just borrowed the money on my and my wife's note and he said Mr. Armstrong owed me some money and I went on his note. I said, 'Well, now, I want you to understand, Vernice, that we're going to expect the balance of this money due under the mortgage the first of the week.' And he said, 'I'll have it in here on Monday.' So I handed the checks, along with the cash to Mr. Pierce and I suggested, I said, 'Mr. Pierce, what do you say we give him to Wednesday to have the balance of this purchase money in here. That will give him plenty of time.' And he said that's agreeable. And we left it at that. There was no other conversation about the matter and Mr. Pierce took the checks and went on back to Greencastle.

"On Wednesday morning, Mr. Pierce called me and he said, 'Have you heard from Mr.

and Mrs. Schopmeyer?' And I said, 'No, sir.' 'Well,' he said, 'this is the day.' And I said, 'Yes. I will go up to the bank and talk to Mr. Riddell about this matter.' I went up to the bank. Mr. Riddell was not at the bank. He was ill.

"Q. You didn't see him or have any conversation with him?

"A. I had no conversation with him. Ted Nesty was there. I said, 'Ted, you know Vernice Schopmeyer brought a couple of bank cashiers drafts Saturday morning and he was supposed to have the rest of the money in here, in my office on Monday. Do you know anything it?' He said, 'No, I don't know anything about it.' He said, 'We loaned him some money.' 'Well', I said, 'You know we have a chattel mortgage on all of his property and he informed me that he only gave you a note and that Joe Armstrong owed him some money and I was wondering if you would be interested in paying the balance under our mortgage and taking the assignment of it, as a matter of protection?' And he said, 'Why, we already have a chattel.' And I said, 'Now, Ted, you surely don't.' He said, 'Well, I'm sure that Mr. Riddell took a chattel mortgage on that.' He went and got the file and brought it up and lo and behold there was a chattel mortgage signed by Mr. and Mrs. Schopmeyer there in the folder. Hadn't been recorded but there was a chattel mortgage. I was astounded and dumbfounded, of course. I suggested to Ted that whenever Mr. Riddell got back, to get in touch with me and we'd see what could be done in regard to the matter. . . . .

. . . . .

"CROSS EXAMINATION, . . . .

. . . . .

"Q. Now, back one more step, you were in the employment, weren't you, Ralph, of the Production Credit?

"A. That's right.

"Q. As their attorney?

"A. Yes, sir.

"Q. Now you saw fit to question Vernice Schopmeyer how he had procured these drafts, had you not?

"A. I had had some experience, as I stated before, with Mr. and Mrs. Schopmeyer and I knowing Mr. Riddell as I did, I rather wondered at him loaning $3000 on an unsecured note.

"Q. In other words, it struck you immediately, you wondered how he got by John Riddell with this sort of a thing?

"A. Yes, that's why I asked him."

Here we have an agent and attorney for the appellant emphatically expressing his suspicion of the transaction of the appellee-bank. To say that the appellant was accepting the checks in good faith and for value, is to strain our credulity.

The facts here were more than ample to support the finding and judgment of the trial court. It is only where the evidence is without conflict and leads to one reasonable conclusion, and the trial court has reached a contrary conclusion, that the decision will be disturbed as contrary to law. *Rowe v. Johnson* (1945), 223 Ind. 289, 60 N. E. 2d 529; *Strasser et al.* v. *Powell et al* (1961), 131 Ind. App. 508, 172 N. E. 2d 439.

Judgment affirmed.

Carson and Wickens, JJ., concur.

Faulconer, J., concurs in result.

NOTE.—Reported in 210 N. E. 2d 872.