**E. BIERHAUS & SONS, INC.,**
**Plaintiff-Appellant,**

v.

**Dennis R. BOWLING,**
**Defendant-Appellee.**

**No. 1–485A96.**

Court of Appeals of Indiana,
First District.

Dec. 19, 1985.

H. Brent Stuckey, Hart, Bell, Deem, Ewing & Stuckey, Vincennes, for plaintiff-appellant.

Glenn G. Hancock, Law Offices of Daniel G. Burke, Jr., Rebecca G. Looney, New Albany, defendant-appellee.

## STATEMENT OF THE CASE

NEAL, Judge.

Plaintiff-appellant, E. Bierhaus & Sons, Inc. (Bierhaus), appeals an adverse decision rendered by the Floyd Circuit Court, without a jury, in favor of defendant-appellee, Dennis R. Bowling (Bowling), in Bierhaus' suit on a check of Bowlings returned for insufficient funds.

We affirm.

## STATEMENT OF THE FACTS

The facts most favorable to support the judgment are as follows. Bowling, David Dabney and their families were neighbors in New Albany, Indiana, and best friends who visited and vacationed together. Bowling was a small contractor and Dabney owned and operated four retail grocery stores. Dabney lived in a nice home, drove a Cadillac automobile, his wife drove an expensive sports car, he owned race horses, lived comfortably, and represented that he owned a lot of real estate as well as the stores. In short, he emanated an aura of prosperity and affluence.

In late September of 1983, Dabney represented to Bowling that he had "cash flow" problems and needed $40,000.00 for 60 days. At the same time, he commenced discussions with Bowling in which he explored the possibility of Bowling coming into the grocery business with him as a 50% partner. Though Bowling deferred decision on any partnership matter until Jan-

uary 1, 1984, he did raise the $40,000.00 by means of a loan obtained by Bowling's parents secured by a mortgage on their real estate. Dabney later obtained additional loans from Bowling of $500.00 for taxes and $8,000.00 for debts. Interest was to be paid at the 14% rate Bowling was required to pay.

Sometime later Dabney, while still pursuing partnership possibilities, represented to Bowling that he was terminating Bierhaus as the wholesale supplier of grocery stock for his stores and would purchase such stock elsewhere. Dabney indicated that in contemplation of the new partnership, he would need a financial statement from Bowling for a potential new supplier. Bowling furnished him one dated October 11, 1982, made out on the letterhead of United States Fidelity and Guaranty Company (USF&G) which had been prepared by Bowling for USF&G and addressed to it for his purpose in obtaining construction bonds. Dabney did not tell him that the financial statement would be for Bierhaus, and nothing on it indicated that it was directed to Bierhaus. Though there were other talks and though Bowling visited Dabney's stores, no terms of partnership were ever agreed upon and no partnership agreement was ever entered into. The loans, according to Bowling, were made to Dabney as a friend.

At some time shortly before November 23, 1983, Dabney again came to Bowling and asked him for a check to be signed in blank, which was to be deposited with the new supplier as security and would not be cashed unless Bowling was first notified. In such event Dabney would reimburse Bowling's account. Bowling told him he had only $1,500.00 in his account, but Dabney assured him it would not matter. Bowling assumed the whole matter was connected with efforts to terminate Bierhaus, and there was no mention that the check was for Bierhaus. Until then, Dabney had never been dishonest with Bowling and Bowling had no knowledge of any financial failure facing Dabney. Bowling signed the check in blank and delivered it to Dabney.

During the time discussed above, Dabney was facing business failure, and among other creditors, he owed Bierhaus $400,000.00. Bierhaus had placed Dabney on a cash or cashier's check basis for grocery stock. Dabney had written 10 to 20 bad checks to Bierhaus for grocery stock, and Bierhaus had taken a mortgage on the stores and security interests in stock and fixtures prior to October 11, 1983. Dabney had delivered Bowling's financial statement to Bierhaus in late October and represented to Jim K. Neeley, Bierhaus' treasurer, that Bowling would be his partner. Neeley caused the ownership of the real estate listed in the statement to be confirmed by Bierhaus' lawyers, and even directed them to prepare a guaranty agreement up to $50,000.00 to be signed by Bowling for Dabney's debt to Bierhaus. Neeley also directed Bierhaus' lawyers to prepare a partnership agreement between Dabney and Bowling, but Neeley later testified he only gave instructions to the lawyers regarding the real estate and guaranty agreement.

At the time that these activities were being performed, and until the receipt of the check in question, Neeley did not know Bowling and had made no contact with him whatever, even though the financial statement bore Bowling's address. He based Bowling's authority on misrepresentations by Dabney. When questioned by the trial judge as to why his lawyers prepared a partnership agreement and a guaranty agreement for Bowling, a total stranger, without ever having consulted him, Neeley was astonishingly vague. He merely explained his reasons for the confirmation of real estate, the partnership agreement and the guaranty agreement by stating: "[W]e wanted assurances that Dennis Bowling was going to do this." Neeley had no knowledge, prior to the issuance of the check in question, of any of the loans Bowling made to Dabney. In addition, Bierhaus had received from Dabney checks for grocery stock signed by Harpers Rest Home, one which had been dishonored prior to November 23, 1983. There appears to have

been a number of checks signed by other people, delivered to Bierhaus by Dabney prior to November 23, 1983, including Dabney's father, totaling several hundred thousand dollars, though there is uncertainty as to whether they had been dishonored by that date. There are suits similar to this one pending brought by Bierhaus on those checks.

Against this background, Dabney, without Bowling's authority, on November 23, 1983, filled out Bowling's signed blank check, payable to Bierhaus for $10,606.79, which amount was prearranged between Neeley and Dabney. When grocery stock was delivered to one of Dabney's stores, the driver, by Neeley's prior directions, accepted the check in payment and delivered it to Bierhaus. Bowling received nothing for the check. The date of the receipt of the check by Bierhaus was November 25. Though Bowling's home address and phone number were on the check, Neeley made no call or inquiry.

Bowling's check was returned for insufficient funds, and Dabney is in bankruptcy. Bierhaus filed suit against Bowling on the check. Paragraph I of his complaint proceeded under IND.CODE 28-2-8-1 for the amount of the check, interest, costs of collection, attorney fees, and court costs, and in Paragraph II he proceeded under IND. CODE 35-43-5-5 and 34-4-20-1 for the proceeds, costs, attorney fees and treble damages. The trial court entered a general judgment for Bowling from which Bierhaus appeals.

## ISSUES

Bierhaus presents five issues for review as follows:

I. Whether Bowling authorized Dabney to complete a blank check executed by Bowling, and therefore whether the judgment of the trial court was clearly erroneous when it relieved Bowling of his obligation to the payee of the check, Bierhaus, which payee had sold groceries in an amount equal to the check in exchange for its check.

II. Whether Dabney materially and fraudulently altered a signed check received from Bowling, which had been supplied to him by Bowling for the purpose of providing the check to a supplier of Dabney, when Dabney filled in the amount of the check, the date of the check and the payee of the check, Bierhaus, and therefore whether the judgment of the trial court was clearly erroneous when it relieved Bowling of his obligation on the check to Bierhaus.

III. Whether Bowling was precluded by his negligence in giving an executed blank check to Dabney from raising the defense of alteration against the payee of the check, Bierhaus, and therefore whether the judgment of the trial court was clearly erroneous when it relieved Bowling of its obligation on the check to Bierhaus.

IV. Whether the payee Bierhaus, which supplied grocery products in an equal amount of the check, but which knew Dabney was in serious financial difficulties, was a holder in due course taking free of any defense Bowling may have against Dabney, and therefore whether the judgment of the trial court was clearly erroneous as a matter of law when it relieved Bowling of his obligation on the check to Bierhaus.

V. Whether Bowling violated the check deception statute IND. CODE 35-43-5-5 when he executed a blank check and delivered same to Dabney, relying upon Dabney to put funds in his account to pay the check.

## DISCUSSION AND DECISION

*Standard of Review.*

The trial court did not make specific findings of fact or conclusions of law, and under such circumstances we will neither

reweigh the evidence nor adjudge the credibility of witnesses, but will consider only the evidence most favorable to support the judgment together with all reasonable inferences to be drawn therefrom. *St. Paul Fire and Marine Insurance Co. v. State Bank of Salem* (1980), Ind.App., 412 N.E.2d 103; *Payroll Check Cashing v. New Palestine Bank* (1980), Ind.App., 401 N.E.2d 752. If sufficient evidence is found to support the judgment on any legal theory, we must affirm, and we will reverse only if the judgment is clearly erroneous. *St. Paul Fire and Marine Insurance Co., supra; Payroll Check Cashing, supra.*

Issues I and II. *Authorization.*

■■■ Bierhaus cites IND.CODE 26–1–3–115 [all future references to the Uniform Commercial Code within title 26, article 1 will be according to chapter and section number] which states:

"Incomplete instruments.—(1) When a paper whose contents at the time of signing show that it is intended to become an instrument is signed while still incomplete in any necessary respect it cannot be enforced until completed, but when it is completed in accordance with authority given it is effective as completed.

(2) If the completion is unauthorized the rules as to material alteration apply (section [26–1–]3–407), even though the paper was not delivered by the maker or drawer; but the burden of establishing that any completion is unauthorized is on the party so asserting."

Under 3–407 an alteration of an instrument is material when an incomplete instrument is completed otherwise than as authorized, or as against any person other than a holder in due course, alteration by a holder which is both fraudulent and material discharges any party whose contract is thereby changed. One who signs a blank check will be liable on it as completed in the hands of a holder in due course. *Griffin v. State* (1976), 171 Ind.App. 543, 357 N.E.2d 917 *trans. denied.*

■■ Bierhaus argues that under the evidence Bowling signed the check in blank and delivered it to Dabney giving him the authority to give it to a supplier. Bowling also knew that a supplier was relying on his financial condition in accepting the check. Bierhaus further argues that whether it is a holder in due course is relevant only if the check was completed contrary to Bowling's authority and Bowling bears the burden of proof of such issue as a defense. *See* 3–307(2).

Bierhaus' assertion that the evidence shows that the check was completed in accordance with the authority given asks us to reweigh the evidence. The trier was justified in finding from the evidence that the authority was intended by Bowling to apply to persons and purposes other than Bierhaus and the purchase of Bierhaus' stock. The evidence most favorable to the judgment shows that Bowling intended the check to be made to a new supplier other than Bierhaus for security only. No authority existed to fill in Bierhaus' name and the amount of $10,606.79. It is undisputed that filling in as payee the name of a person other than that intended is material. From the entire circumstances, consisting of the stratagems employed, Dabney's straitened financial condition, similar bad check ploys on Harpers Nursing Home and his father, the court was justified in finding that Dabney's acts were fraudulent.

Issues III and IV. *Negligence and Holder in Due Course.*

■■ These two issues are the heart of Bierhaus' appeal, and from the record, the trial court considered them to be the principal issues. Bierhaus argues that though a fraudulent and material alteration may discharge Bowling under 3–407, he is precluded from asserting that defense because of his negligence and because Bierhaus is a holder in due course. Regarding the issue of negligence, Sec. 3–406 provides:

"Negligence contributing to alteration or unauthorized signature.—Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority

against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business."

Our court in *Griffin*, 171 Ind.App. at 553, 357 N.E.2d at 924 stated:

"It is well settled that one who signs a blank check will be liable on it as it is completed. *Geddes v. Blackmore* (1892), 132 Ind. 551, 32 N.E. 567; *Snodgrass v. Sweetser* (1896), 15 Ind.App. 682, 44 N.E. 648. This rule survives under the UCC.IC 1971, 26–1–1–103. A holder in due course may enforce an incomplete check as completed. IC 1971, 26–1–3–407(3). But see IC 1971, 26–1–3–304(1)(a) and (4)(d). Others who without negligence pay a check which was fraudulently and materially altered by the holder may enforce it against a negligent drawer. IC 1971, 26–1–3–406 and 26–1–3–407(2)(a). The Indiana Comment to IC 1971, 26–1–3–406 states:

'The Code now treats the signing of an incomplete instrument as conclusive evidence of negligence under Sec. 3–407.'

See also IC 1971, 26–1–3–115 and 26–1–3–401(1)."

Nevertheless, in matters of negligence, contributory negligence, the failure of the plaintiff to use ordinary care, will bar his recovery under 3–406. *J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code*, Sec. 16–7, 16–8 (2d ed. 1980). Negligence or contributory negligence is a question of fact for the trier in any particular case. *Insurance Company of North America v. Purdue National Bank of Lafayette* (1980), Ind. App., 401 N.E.2d 708. Such result necessarily follows from the use of the words "reasonable commercial standards" in 3–406. The case of *Clark v. Griffin* (1985), Ind.App., 481 N.E.2d 170, concerning a forged endorsement under 3–419(3) which affords protection to a bank who has in good faith paid the instrument "in accordance with reasonable commercial standards," we held that there was imposed upon the bank a duty of inquiry when confronted by the suspicious circumstances therein existing. In short, an objective standard was created by the words "reasonable commercial standards."

Though the signing and the delivering of a blank check may be negligence, it remains to be determined whether, as a matter of law, Bierhaus acted in accordance with reasonable commercial standards or was a holder in due course. A holder in due course is defined in 3–302:

"Holder in due course.—(1) A holder in due course is a holder who takes the instrument

(a) for value; and

(b) in good faith; and

(c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

(2) A payee may be a holder in due course."

A holder is a person in possession of the instrument. 1–201(20). A holder takes for value when he takes the instrument in payment of or as security for an antecedent claim whether or not it is due. 3–303(b). Good faith means honesty in fact in the conduct or transaction concerned. 1–201(19). Under 3–304 a purchaser has a notice of a claim or defense if he "(b) ... has notice that the obligation of any party is voidable in whole or in part...." Section 1–201(25) defines notice:

"(25) A person has 'notice' of fact when:

(a) He has actual knowledge of it; or

(b) He has received a notice or notification of it; or

(c) From all the facts and circumstances known to him at the time in question he has reason to know that it exists.

A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it. 'Discover' or 'learn' or a word or phrase of similar import refers to knowledge rather than to reason to know. The time and circumstances under which a notice

or notification may cease to be effective are not determined by IC 26–1."

After a defense is shown the person claiming the rights of a holder in due course has the burden of establishing that fact. 3–307.

■■ The critical legal question now becomes whether the conduct of the holder is measured by a subjective or objective standard. The Indiana Comments to 3–302 lay this matter to rest, including matters of burden of proof;

"(1) A holder in due course must take the instrument for value and in good faith, which is defined to mean honesty in fact. Compare Sec. 1–201 (19). The holder must establish subjective honesty, and, as under prior law, circumstances or knowledge of circumstances which would cause a reasonable man to make further inquiry are not enough to establish bad faith. E.G., *First Nat. Bank v. Garner*, 187 Ind. 391, 118 N.E. 813 (1918); *Colvert v. Harrington*, 61 Ind.App. 608, 112 N.E. 249 (1916) (indorsee taking note 'without recourse' not guilty of bad faith). However, a holder in due course must also take the instrument without 'notice' that it is overdue or has been dishonored, or of any defense or claim on the part of any person. Since notice is defined as 'reason to know' from all the facts and circumstances known to him at the time in question, the Code requires the holder in due course to establish that he has fulfilled the 'reasonable man' standard of inquiry as to facts within his 'knowledge.' See Sections 1–201(25), 3–304(3). This means that the jury must be instructed on both the matter of good faith and the matter of notice. A holder may take in bad faith, but without notice of defense and the like. He may take with notice, but in good faith. He must pass both tests. This seems to adopt the law substantially as it was prior to the N.I.L. Cf. *State Bank v. Lawrence*, 177 Ind. 515, 96 N.E. 947, 42 L.R.A. (n.s.) 326 (1912).

\* \* \* \* \* \*

Under Section 3–307(3) the burden of pleading and proof on due course holding is placed upon the holder. Indiana cases are reluctant to allow a verdict to be directed for the party carrying the burden of proof although his evidence is not disputed. See the following cases where the court refused to direct a verdict in favor of the holder or held that the question of due course holding was a question for the triers of fact. *Mesel v. Farmers' & Merchants' Bank*, 95 Ind.App. 33, 178 N.E. 305 (1931) (in suit against indorser evidence was disputed as to whether or not holder had notice—court emphasized that verdict should not be directed in favor of party with burden of proof); *Commercial Sav. Bank v. Raber*, 90 Ind. App. 335, 168 N.E. 697 (1929); *Ohio Contract Purchase Co. v. Bolin*, 90 Ind.App. 85, 168 N.E. 196 (1929) (although testimony of officer of holder as to due course holding was unrefuted, 'There may have been something in his demeanor, and in some things he said, that had the effect of impeaching his testimony'); *Woodsmall v. Myers*, 87 Ind.App. 69, 158 N.E. 646 (1927) (verdict against holder sustained on possibility of holder's demeanor as witness, purchase of $1000 note for $750, fact that transferor not called as witness, and inconsistencies in pleadings); *National City Bank v. Kirk*, 85 Ind.App. 120, 134 N.E. 772, (1922) (applied rule that court would not direct verdict in favor of holder carrying burden of proving due course holding)."

Clearly, a person claiming holder in due course status has the double hurdle of proving good faith, a subjective test, plus lack of notice, an objective test. Such rationale was followed in *Western State Bank of South Bend v. First Union Bank and Trust Company of Winamac* (1977), 172 Ind.App. 321, 360 N.E.2d 254. The cases of *Greencastle Production Credit Association v. Riddell National Bank* (1965), 137 Ind.App. 686, 210 N.E.2d 872, and *Woodsmall, supra,* stand for the proposition that where matters are known to a holder or are brought to his attention which would put a reasonably prudent man

on inquiry, such inquiry must be made at the peril of being deprived of holder in due course status. A holder may not be permitted to willfully close his eyes and excuse himself on the grounds he did not see. The trier has a right to consider, along with other circumstances, the fact that such inquiry with reasonable opportunity was not made.

Bierhaus relies heavily upon *St. Paul Fire and Marine Insurance Co., supra.* In that case a check, intended to be $478.00 which was inserted in the place for numbers, bore the amount in the place for writing $100,478.23, imprinted by a check writer. A 100 was crudely inserted before the 478. The check was written by a grain buyer whose writer mistakenly inserted the larger amount to a farmer with a known history of bad credit and bad checks. Though the bank officer indicated suspicion, because the check was so large, he accepted the check. The trial court, applying the objective test to 3–304, concluded that the bank officer had acted as a reasonably prudent man and the bank was a holder in due course. We said, in affirming the trial court's decision in accordance with our standard of review, that "we cannot say as a matter of law that the bank acted unreasonably in relying upon the amount expressed by the check writing machine." *Id.* 412 N.E.2d at 111. This matter, as well as the case at bar, is fact sensitive. Under our standard of review we may not second guess the trial court on factual matters. Thus, Bierhaus may not rely on factual similarities as conclusive as to the ruling here, where the trial judge determined that Bierhaus was not a holder in due course.

A factor to consider here is that the check was not received in the usual course of business. Older cases, discussing the negotiable instrument law existent prior to the UCC, but which did not define a holder in due course materially different than does 3–302, used the expression in describing a holder in due course as one who accepts the instrument in the usual course of business. *Chicago District Electric Generating Corp. v. Evans* (1946), 117 Ind. App. 280, 69 N.E.2d 627 *trans. denied.* In truth, the term holder in "due course" implies that such matters as exist here are extraordinary. The check here was received by Bierhaus only after a succession of events, set out above, that do not attend the ordinary course of selling grocery stock.

In a recapitulation we state: signing and delivering a blank check is such negligence which can expose the maker to liability to a holder in due course or to a person who pays the instrument in accordance with reasonable commercial standards. The term reasonable commercial standards and notice under 1–201(25) invoke an objective standard wherein the conduct of the holder is measured against that of a reasonably prudent man. Under an objective standard where a holder comes into possession of information which would dictate further inquiry by a reasonably prudent person, he may be denied holder in due course status if he fails to make such inquiry. The holder has the burden of proving that he was acting in accordance with reasonable commercial standards, or that he was acting in good faith *and* he was without notice. Such question is a question of fact for the trier.

Under the facts of this case we cannot say that Bierhaus carried its burden of proof, or that the court erred in finding that Bierhaus was not a holder in due course. The court could have easily inferred that Bierhaus, facing a $400,000.00 loss, either knew of the circumstances, or closed its eyes and in bad faith simply did not seek the truth in order to get its money. Bierhaus received a number of bad checks from Dabney, bad checks from other people, and an old financial statement of Bowlings addressed to USF&G confirming only part of it. Extraordinarily, it caused *its* attorney to prepare a partnership agreement and a guaranty agreement for Bowling's signature based upon Dabney's representation. All this dealing by Bierhaus with the gullible Bowling's interests was done without once contacting Bowling whom it did not know, but whose address it

had. Not only could the trial court infer that Bierhaus knew or had reason to know of the problems with the check, it could have, with equal facility, inferred that Bierhaus helped build the trap for the hapless Bowling.

Issue V. *Check Deception.*

Here Bierhaus argues that since Bowling intentionally issued the draft for payment knowing that it would not be paid, he committed check deception under IND.CODE 35–43–5–5 entitling Bierhaus to recover under IND.CODE 34–4–30–1. We again remind Bierhaus of our standard of review. The trial court was not compelled to accept its interpretation of the facts.

For the above reasons, this cause is affirmed.

Judgment affirmed.

RATLIFF, P.J. and ROBERTSON, J., concur.