905 P.2d 506

FINANCIAL MANAGEMENT SER-
VICES, INC., a foreign corpo-
ration, Plaintiff–Appellee,

v.

FAMILIAN CORPORATION, a California
corporation; and John Doe,
Defendant–Appellant.

No. 1 CA–CV 92–0345.

Court of Appeals of Arizona,
Division 1, Department A.

Jan. 17, 1995.

Review Denied Nov. 21, 1995.

Reconsideration Denied April 5, 1995.

---

Mariscal, Weeks, McIntyre & Friedlander, P.A. by Robert A. Shull, Michael P. West, Phoenix, for appellant.

Gammage & Burnham by Ellen Harris Hoff, and Hammerman & Hultgren, P.C. by Stanley M. Hammerman, Jon R. Hultgren, Phoenix, for appellee.

## OPINION

TOCI, Judge.

Familian Corporation appeals the trial court's judgment in favor of Financial Management Services, Inc. ("FMSI") in FMSI's action to recover sums collected by Familian from accounts receivable of their common debtor, Pima Plumbing Contractors, Inc. ("Pima"). The appeal raises three issues:

(1) did FMSI's security interest attach to the joint checks, representing accounts receivable proceeds, that Pima's account debtors negotiated to Pima and Familian as co-payees;

(2) was Familian a holder in due course of the joint checks, thus allowing Familian to take the proceeds they represented free of FMSI's security interest; and

(3) did Familian receive the joint checks through transfers in the ordinary course of Pima's business, thus allowing Familian to take the accounts receivable proceeds free of FMSI's security interest pursuant to UCC section 9–306(2)?[1]

We hold that although FMSI's security interest continued in the accounts receivable proceeds paid to Familian, Familian took those proceeds free of FMSI's prior security interest because Familian was a holder in due course of the joint checks issued by Pima's account debtors. Because our resolution of the first two issues disposes of this appeal, we need not consider whether the issuance of the joint checks constituted transfers in the ordinary course of Pima's business. Accordingly, we reverse the trial court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

FMSI provides financing for contractors who are customers of construction material wholesalers. One of the wholesalers through which FMSI provided financing was Stapley Wholesale, Inc. ("Stapley"). Like all of FMSI's "member" wholesalers, Stapley entered an agreement with FMSI under which Stapley guaranteed full payment of any loans made by FMSI to Stapley's customers and promised to pay any such loans that might go into default.

In 1985, FMSI began providing financing to Pima, a customer of Stapley, through a series of promissory notes and security agreements. Under this arrangement, Pima granted FMSI a security interest in all its accounts receivable, inventory, and equipment. FMSI filed a financing statement with the Arizona Secretary of State in 1986. The security agreements did not restrict Pima's right to use accounts receivable payments that it collected in the ordinary course of its business. FMSI permitted Pima to pay its other creditors (e.g., employees, landlords, utility companies, and suppliers) from amounts that project owners or general contractors paid to Pima on account.

Through the FMSI loan program, Pima purchased materials from Stapley over a four-year period. Pima made payments to FMSI through Stapley every month through August 1989. Pima made no payments after September of 1989.

In August of 1988, Pima entered into a security agreement with Familian, and Familian filed a financing statement with the Arizona Secretary of State. Like FMSI's security agreement, Familian's agreement covered Pima's accounts receivable. Thereafter, Familian sold materials and supplies to Pima on open account.

Though Pima, like many in the construction industry, did not always make its loan payments when due, both FMSI and Familian considered Pima a good customer. In fact, neither FMSI nor Familian ever sus-

---

1. Arizona substantially adopted the 1972 revised version of the Uniform Commercial Code ("UCC") in 1975 Ariz. Sess. Laws 65, by amending and deleting portions of a prior version of the UCC adopted in 1967 Ariz. Sess. Laws 3, and enacting additional sections that were introduced in the 1972 UCC. The legislature renumbered Arizona's version of the UCC to conform to the UCC numbering system. 1984 Ariz. Sess. Laws

77. In this opinion, we refer to the applicable sections of the Arizona UCC according to their designation and numbering in the current version of the UCC: e.g., UCC § 9–306(2) (equivalent to Ariz.Rev.Stat.Ann. ("A.R.S.") § 47–9306(B)). *See Deutsche Credit Corp. v. Case Power & Equip. Co.*, 179 Ariz. 155, 157 n. 1, 876 P.2d 1190, 1192 n. 1 (App.1994).

pected that Pima was in financial trouble. Furthermore, neither party ever considered Pima to be in default on a loan.

In August 1989, at a time when Pima owed Familian approximately $400,000, of which $100,000 was thirty days past due, Familian learned that Pima had made a payment of over $200,000 to FMSI through Stapley. In response, Familian, concerned about the size of Pima's debt, constructed a debt-reduction plan. Under this plan, Familian and Pima agreed to direct Pima's account debtors to make all further payments jointly to Familian and Pima. In September 1989, Familian and Pima each sent letters to Pima's account debtors directing them to make payments by joint check, naming Familian and Pima as co-payees. The parties also agreed that Familian would not extend Pima any credit until Pima's debt fell below $250,000.

Under the arrangement, Pima would notify Familian each time it received a joint check, and the parties would confer and agree on a percentage split of the funds. Familian would then prepare its own check payable to Pima in the amount of Pima's share. In return, Pima would indorse the joint check and negotiate it to Familian. From September 25 through November 30, 1989, joint checks totalling $1,157,920.95 were received. Familian retained $353,327.20 and remitted $804,593.75 to Pima.

On about September 20, 1989, Familian received a UCC–1 search that listed FMSI as a prior perfected secured creditor of Pima. Consequently, when Familian received monies from Pima's account debtors it knew that FMSI was a prior secured creditor of Pima. Familian did not inform FMSI about the joint check arrangement or inquire of FMSI about Pima's status.

Familian used the money it retained from the joint checks to pay both Pima's preexisting secured debt and new charges for supplies it sold to Pima on current jobs. At the end of October 1989, Familian notified Pima that its balance was below $250,000 and that it would once again sell supplies to Pima on credit as long as the total balance did not exceed that amount. Familian and Pima received their last joint check on November 30,

1989. Familian received no further payments on Pima's debt.

Pima last paid Stapley toward its indebtedness to FMSI on September 10, 1989. When Stapley later asked Pima about its difficulty making payments, Pima's president assured Stapley that the difficulty resulted from Pima's expansion into the Phoenix and Las Vegas markets and that business was fine. Conseqeuntly, Stapley continued to sell Pima a substantial amount of construction materials.

In early November, Pima's president called Stapley and agreed to a meeting that afternoon. He did not go to the meeting, however, and was never heard from again. Pima closed down, and Stapley started contacting Pima's account debtors.

In late 1989 or early 1990, Stapley discovered that Familian had previously instructed Pima's account debtors to pay Familian directly. At that time, Stapley and FMSI notified 115 of Pima's account debtors of FMSI's security interest and directed them to pay FMSI. FMSI requested that Stapley repurchase FMSI's loans to Pima in accordance with its membership agreement, but Stapley was unable to do so. In the end, Pima owed Familian more than $100,000 and FMSI more than $700,000.

FMSI sued Familian to recover the accounts receivable proceeds that Familian collected from Pima's account debtors. After a bench trial, the trial court ruled in favor of FMSI in the amount of $353,327.20 with interest. The trial court concluded:

1. FMSI and Familian had perfected security interests in Pima's accounts receivable.

2. FMSI had a prior perfected security interest in Pima's accounts receivable.

3. Familian was not a holder in due course of the Joint Checks and did not take them free of FMSI's security interest.

4. Familian's collection of the Joint Checks was not a disposition of the proceeds of Pima's accounts receivable in the ordinary course of Pima's business.

5. FMSI did not waive its security interest in the Joint Checks.

6. [Familian] impermissibly interfered with Pima's accounts receivable and is liable to [FMSI] for the sums retained through the device of a constructive trust and an equitable lien upon [Familian]'s assets to the extent [FMSI] has been damaged.

7. [Familian] knowingly interfered with [FMSI]'s security interest with the foreknowledge that it was a junior creditor to [FMSI].

8. [Familian] committed conversion.

9. [FMSI] is entitled to an accounting from [Familian] as to monies received.

Familian timely appealed. FMSI filed an untimely notice of cross-appeal, which was dismissed.

## II. DISCUSSION

### A. Did FMSI's Security Interest Attach to the Accounts Receivable Proceeds Collected By Familian?

■ Familian contends that FMSI's security interest in Pima's accounts receivable did not "attach" to the proceeds that Familian obtained. Familian relies on UCC section 9–306(2), which provides:

> Except where this [chapter] otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and *also continues in any identifiable proceeds including collections received by the debtor.*

(Emphasis added.) Familian reasons that Pima never "received" the accounts receivable proceeds because Familian deposited those proceeds in its own account and then issued separate checks to Pima for its share. Because Familian, not Pima, cashed the joint checks, Familian concludes that FMSI's security interest in the checks was cut off. We disagree.

Initially, we recognize a conflict in the case law concerning the interpretation of UCC section 9–306(2). For instance, in *Centerre Bank v. New Holland Div. of Sperry Corp.,* 832 F.2d 1415, 1420 (7th Cir.1987), the court held that under UCC section 9–306(2), a security interest continues only in proceeds received by the debtor. *Accord First Interstate Bank v. Arizona Agrochem. Co.,* 731 P.2d 746, 748 (Colo.App.1986). Taking the opposite view, *Farmers & Merchants Nat'l Bank v. Fairview State Bank,* 766 P.2d 330, 334 (Okla.1988), held that a security interest attaches to proceeds of collateral even if the debtor did not receive those proceeds. *Accord Bank of Okla. v. Islands Marina, Ltd.,* 918 F.2d 1476, 1481 (10th Cir.1990). Nevertheless, even if we assume that UCC section 9–306(2) conditions continuation of the security interest on the debtor's actual receipt of the proceeds of accounts receivable collateral, Familian's contention fails in this case.

Pima both legally and physically "received" the joint checks. In *Brown Wholesale Electric Co. v. Beztak of Scottsdale, Inc.,* 163 Ariz. 340, 343, 788 P.2d 73, 76 (1990), our supreme court held that a materialman's indorsement of a joint check payable to him and a subcontractor constituted receipt of payment by the materialman absent a contrary agreement with the owner or the general contractor. Here, contrary to Familian's intimation, the proceeds of Pima's accounts receivable were not deposited directly in Familian's account. All account payment checks were first sent to Pima. Pima would indorse the checks and then forward them to Familian. Pima, therefore, had physical possession of the checks. In addition, the checks constituted proceeds because they were received "upon the ... collection ... of collateral" within UCC section 9–306(1). Thus, FMSI's security interest attached to the accounts receivable proceeds collected by Familian.

### B. Was Familian a Holder In Due Course?

■ Familian argues that when it gained possession of the joint checks indorsed by Pima, it became a "holder in due course" of those checks and, therefore, took them free of FMSI's competing interest. Whether a holder is a holder in due course is a factual question. *See First Nat'l Bank v. Jarnigan,* 794 S.W.2d 54, 58 (Tex.App.1990). Thus, we are obliged to affirm the trial court

unless its findings were clearly erroneous. *K & K Mfg., Inc. v. Union Bank,* 129 Ariz. 7, 9, 628 P.2d 44, 46 (App.1981). That is the case here. The record lacks evidence sufficient to sustain the trial court's conclusion that Familian was not a holder in due course of the joint checks.

■ To qualify as a holder in due course, a party must satisfy four requirements. First, the party must be a "holder," defined as a person who possesses an instrument "drawn, issued or indorsed to him or to his order or to bearer or in blank." UCC section 1–201(20). The last three requirements are described in UCC section 3–302(1):

> A holder in due course is a holder who takes the instrument:
>
> 1. For value; and
>
> 2. In good faith; and
>
> 3. Without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.[2]

There is no dispute that Familian was a "holder" of each joint check it received. Familian also took the checks for "value," because it acquired each "in total or partial satisfaction of a pre-existing claim...." UCC section 1–201(44)(b). The parties differ only on the question of whether Familian took the checks "in good faith" and "without notice ... of any ... claim to it on the part of any person."

■ We conclude that Familian acted in good faith. UCC section 1–201(19) defines "good faith" as "honesty in fact in the conduct or transaction concerned." 1 James J. White & Robert S. Summers, *Uniform Commercial Code* section 14–6, at 709 (3d ed. 1988) states:

> The good faith requirement has been the source of a continuing and ancient dispute. The question has been whether courts are to apply a so-called objective test (i.e., if a reasonably prudent man behaved the way the alleged holder in due course behaved, would he have been in good faith?) or whether the test should be subjective (i.e.,

irrespective of a reasonable prudent man's reaction to this circumstance, was this alleged holder in due course acting in good faith, however stupid and negligent his behavior might have been?) ... At the conclusion of the scrimmaging among the Code drafters and the various proponents of different positions, it was clear that the draftsmen intended to adopt a subjective standard for the good faith test in Article Three.

As described in the above passage, the majority rule recognized by the courts and commentators is that the definition of good faith as "honesty in fact in the conduct or transaction concerned" creates a subjective test for good faith under which it is sufficient that the holder honestly believe there is nothing wrong. *In re Joe Morgan, Inc.,* 985 F.2d 1554, 1560 (11th Cir.1993). Whether there may be "reason to know" that something is wrong is immaterial. *Id.; Allstate Fin. Corp. v. Financorp., Inc.,* 934 F.2d 55, 59 (4th Cir.1991); *Dallas Bank & Trust Co. v. Frigiking, Inc.,* 692 S.W.2d 163 (Tex.App. 1985).

Here, the record contained no evidence from which the trial court could reasonably have concluded that Familian believed that Pima committed a wrong or violated someone's rights by transferring payments from its account debtors to Familian. As evidence of Familian's lack of good faith, FMSI relies exclusively on the records search that Familian received in September 1989, indicating that FMSI had filed a financing statement in 1986, covering Pima's accounts receivable, inventory, and equipment. The filing of that financing statement, however, could not alone charge Familian with knowledge that either it or Pima would act wrongfully by performing their joint check agreement. Had Familian believed that Pima was on the verge of bankruptcy or unable to pay FMSI, Familian's actions may have constituted bad faith. The record is clear, however, that Familian believed that Pima's business was strong and that Familian knew that Pima had made a large payment to FMSI. Thus, this record

---

**2.** In 1993, Arizona adopted the 1990 revision of UCC article 3. *See* 1993 Ariz. Legis. Serv. 108 (West). Nevertheless, the version of article 3 in effect in 1989, controls this case.

does not support a finding that Familian acted in bad faith.

The record also contains no evidence from which the trial court could reasonably have concluded that Familian took the joint checks from Pima with "notice" of a "claim to it on the part of any person." "Notice" entails "actual knowledge of a defense or of such facts that would alert a [holder] to a possible defense." *Stewart v. Thornton,* 116 Ariz. 107, 109, 568 P.2d 414, 416 (1977). *But see E. Bierhaus & Sons, Inc. v. Bowling,* 486 N.E.2d 598 (Ind.App.1985) (failure to inquire precludes holder in due course status where circumstances would put reasonable person on inquiry) (criticized in 1 White & Summers, *supra,* § 14-6, at 711-12). Furthermore, Commentary No. 7 of the UCC Permanent Editorial Board, 3B *Uniform Laws Annotated* 626 (1992), provides an example of the relationship between UCC articles 3 and 9:

> When the account debtor pays B [junior secured party] by check, or when the debtor indorses and delivers to B a check drawn by the account debtor to the order of the debtor, B will be a holder of the check. If B takes the check under the circumstances described in § 3-302(1), B will be a holder in due course. See § 3-302(1) and (2). A's [senior secured party] filed financing statement *does not* constitute notice to B of A's claim to the check and does not preclude B from being a holder in due course. See § 3-305(1). Specifically, B takes priority over A's earlier, perfected security interest in the check and is entitled to keep the funds received when the check is paid.
>
> ... if B takes the check under circumstances that preclude B from being a holder in due course (e.g., if a notation on the check gives B reason to know that the check constitutes A's proceeds) ... then B would take the check subject to A's security interest. See § 3-306(a).

*Id.* at 626-27.

Consistent with the above principles, *Dallas Bank* held that a senior secured creditor's filing of a financing statement did not preclude the junior secured creditor from collecting a debt even though the debtor had filed for bankruptcy. 692 S.W.2d at 167.

The court reasoned, "Notice of a claim refers to a claim against the particular instrument, and not notice of the general insolvency of the drawer or maker." *Id.* The court concluded:

> [T]here is no legally sufficient evidence to show that Dallas Bank had notice that any check it received as payment 'was overdue or had been dishonored' or was subject to any defense against or claim to it on the part of any person.... Dallas Bank's status as a holder in due course gave it priority over Frigiking's prior security interest, and Frigiking's filing was not 'notice' as contemplated by [UCC Section 9-309].

692 S.W.2d at 166-67; *cf. Merchants Nat'l Bank & Trust Co. v. United States,* 202 Ct.Cl. 343, 1973 WL 21348 (1973).

*Merchants,* which involved a fiduciary who improperly wrote checks on a trust account, supports our analysis. There, the fiduciary, in violation of its security agreement concerning a trust account that it maintained as collateral for a loan, drew checks on its secured trust account to pay its past due federal taxes. 202 Ct.Cl. at 345, 1973 WL 21348. The court held that the government was a holder in due course of the checks despite knowledge that the debtor was a fiduciary and despite the senior creditor's prior filing of a financing statement. *Id.* at 346-47, 1973 WL 21348. The court added:

> the Government, even if it had official notice that [the debtor] was a fiduciary with respect to [the senior creditor], cannot be held also to have had notice that [the debtor] was acting improperly ... Even if the Government were chargeable with knowing the full terms of the security agreement, there was nothing to give it notice that [the debtor] had breached its duty to [the senior creditor]; creditors of [the debtor], like the defendant, could well believe that one of the prime purposes of the arrangement between [the senior creditor] and [the debtor] was to enable the latter to pay its proper business obligations. Recipients of routine checks in due and normal course of business are not required to

make searching inquiries in depth, before accepting payment.

*Id.* at 347, 1973 WL 21348.

*Merchants* is analogous to this case. There, mere knowledge of the debtor's fiduciary status did not constitute notice of a possible claim to the instrument. Here, no evidence was offered that Familian knew anything other than that (1) FMSI had filed an earlier financing statement naming the same kind of collateral in which Familian had a security interest, and (2) Pima had recently paid FMSI $200,000.00. These facts, however, did not suggest that Pima was in default on its obligation to FMSI. If anything, such facts would suggest that Pima's obligation to FMSI had been brought current. Thus, contrary to FMSI's contention, this record raises no inference that Familian refrained from investigating out of fear that it would discover that FMSI had a claim to the joint checks. We conclude, therefore, that because no facts suggested that Pima could not pay its debt to FMSI, Familian had no notice that FMSI had a claim to the joint checks. *See Dallas Bank,* 692 S.W.2d at 167; *see also Joe Morgan,* 985 F.2d at 1561–62 (ruling that junior creditor was not holder in due course because it knew of prior security interest and of debtor's "desperate" financial condition).

We would reach the same result even if we applied the controversial *Bowling* test, cited above, which requires inquiry where the circumstances "would put a reasonably prudent man on inquiry." 486 N.E.2d at 604–05. As discussed above, the existence of a prior security interest did not give Familian notice of a possible claim to the checks because Familian had no reason to suspect that Pima could not pay FMSI. Familian, therefore, had no obligation to make further inquiry before continuing to collect against the amount Pima owed it.

FMSI contends that *New Hampshire Business Development Corp. v. F.R. Lepage Bakery, Inc.,* 832 F.2d 7 (1st Cir.1987), controls this case. There, the common debtor defaulted on its loans from both the senior secured creditor and the junior secured creditor. *Id.* at 9. The junior creditor, knowing about the prior perfected security interest, instructed the debtor's account debtors to make payments directly to the junior creditor. *Id.* The senior creditor discovered this arrangement, informed the junior creditor of its right to the accounts receivable, and ordered the junior creditor to cease collecting on the accounts. *Id.* The junior creditor ignored the senior creditor and entered a factoring agreement under which it collected on the accounts. *Id.* The junior creditor also ignored the senior creditor's numerous requests for an accounting of the proceeds collected by the junior creditor. *Id.*

The above discussion demonstrates that the facts of *New Hampshire* are distinguishable from this case. Here, neither Familian nor FMSI considered Pima to be in default and neither party suspected that Pima was having financial difficulties. Thus, unlike the junior creditor in *New Hampshire,* Familian had no notice that FMSI had a claim to the joint checks. *New Hampshire,* therefore, is not applicable here.

FMSI also contends that *Bank of the West v. Commercial Credit Financial Services, Inc.,* 655 F.Supp. 807 (N.D.Cal.1987), *reversed,* 852 F.2d 1162 (9th Cir.1988), makes the holder in due course issue irrelevant. There, the district court rejected the junior creditor's holder in due course argument. The court held that the junior creditor had constructive knowledge of the senior creditor's interest in accounts receivable that the debtor assigned to the junior creditor. *Id.* at 820. According to FMSI, *Bank of the West* supports the proposition that FMSI's claim is really one for the value of the accounts converted by Familian, governed by UCC article 9 (secured transactions) rather than UCC article 3 (commercial paper). We decline to follow *Bank of the West* for two reasons.

First, the facts of *Bank of the West* are distinguishable. There, the debtor assigned its accounts receivable to the junior creditor in violation of the debtor's security agreement with the senior creditor. 655 F.Supp. at 818. Here, FMSI's security agreement with Pima did not restrict Pima's ability to use its accounts receivable proceeds to satisfy its other financial obligations.

Second, and more important, the Ninth Circuit in *Bank of the West* reversed the

district court's decision that the junior creditor converted the senior creditor's collateral. Contrary to FMSI's contention, the Ninth Circuit did not reverse *Bank of the West* on a ground unrelated to this appeal. Although it is true that the Ninth Circuit struck the district court's conversion analysis without referring to that court's holder in due course analysis, the district court's holder in due course analysis hinged on its conversion analysis. Specifically, the district court distinguished other holder in due course cases because, in the court's opinion, the junior creditor had committed conversion by diminishing the value of the debtor's accounts receivable with knowledge of the senior creditor's interest in the value of those accounts. *See id.* at 820. Thus, by rejecting the district court's conversion analysis, the Ninth Circuit also implicitly rejected the court's holder in due course analysis.

FMSI additionally argues that UCC section 3–302(3)(c) precluded Familian from becoming a holder in due course because Familian acquired the joint checks in "a bulk transaction not in [the transferor's] regular course of business." "Whether a transfer is a bulk transaction not in the regular course of business turns on the facts of the particular case." *Combine Int'l v. Berkley,* 141 A.D.2d 465, 529 N.Y.S.2d 790, 793 (N.Y.1988). Applying this standard, we reject FMSI's section 3–302(3)(c) argument.

The joint check arrangement was neither a bulk transaction nor one outside the scope of Pima's normal business. Pima, in the normal course of its business, purchased supplies from Familian on credit. After Pima's debt to Familian rose to $400,000, Familian instituted the joint check arrangement. Such an arrangement is common in the construction industry. *Brown Wholesale Elec. Co.,* 163 Ariz. at 343, 788 P.2d at 76. Under the arrangement, when Pima's account debtors made their normal payments to Pima, the debtors simply made Familian a co-payee. The arrangement, however, was shortlived, lasting only a few months. On these facts, we conclude that UCC section 3–302(3)(c) is inapplicable to this case.

■ Finally, FMSI contends that even if Familian was a holder in due course, Famili-

an is still liable for conversion because UCC section 3–103(2) states that article 3 is subject to article 9. This argument lacks merit. A junior secured creditor who is a holder in due course of a negotiable instrument takes the instrument free of any party's prior security interest in the instrument. *See, e.g.,* UCC § 9–309; *Allstate Fin. Corp.,* 934 F.2d at 59–60.

## C. May Familian Recover Its Attorneys' Fees?

■ Familian's request for attorneys' fees pursuant to A.R.S. section 12–341.01(A) is based on our recent decision in *Deutsche Credit Corp.,* 179 Ariz. at 163–64, 876 P.2d at 1198–99. There, we awarded attorneys' fees in an action for conversion of a secured creditor's collateral because the debtor's sale of the collateral constituted a breach of its security agreement. *Id.* Here, on the other hand, the joint check arrangement did not violate Pima's security agreement with FMSI. Thus, *Deutsche Credit* is distinguishable from this case. Furthermore, we are mindful of the fact that both Familian and FMSI were victims of Pima's unexpected collapse—Familian lost over $100,000; FMSI lost over $700,000. Consequently, we decline to award attorneys' fees to Familian.

## IV. CONCLUSION

The trial court's finding that Familian did not qualify as a holder in due course of the joint checks issued by Pima's account debtors was incorrect. Accordingly, we reverse and direct the trial court to enter judgment in favor of Familian.

JACOBSON, P.J., and CONTRERAS, J., concur.